IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES ex rel. ROSALIE MENOTTI (#K-93533), | ) ) ) |
| Petitioner, | ) ) |
| v. | ) Case No. 06 C 6397 ) ) |
| MARY SIGLER, WARDEN, DWIGHT CORRECTIONAL CENTER, | ) ) ) |
| Respondent. | ) ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is pro se Petitioner Rosalie Menotti's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(1). For the following reasons, the Court denies Menotti's habeas petition.

## BACKGROUND

Menotti does not present clear and convincing evidence challenging the statement of facts set forth in the Illinois Appellate Court's opinions affirming the Circuit Court of Cook County, and thus the Court presumes those facts are correct for purposes of its habeas review. *See* 28 U.S.C. § 2254(e)(1); *see also Virsnieks v. Smith,* 521 F.3d 707, 714 (7th Cir. 2008). The Court therefore adopts the underlying facts as set forth by the Illinois Appellate Court, First District. *See People v. Menotti,* 1-02-3413 (Ill.App.Ct. Mar. 3, 2004) (post-conviction appeal); *People v. Menotti*, No. 1-99-3576 (Ill.App.Ct. Dec. 19, 2001) (direct appeal). The Court begins with a recounting of the facts determined by the Illinois Appellate Court. *See Easley v. Frey,* 433 F.3d 969, 970 (7th Cir. 2006).

I.   **Factual Background**

   A.   **State's Case**

On July 19, 1996, Petitioner Rosalie Menotti shot and killed her husband, Nicholas Menotti, at their apartment. Following a bench trial in 1999, the trial court convicted Menotti of first degree murder. At trial, Mendotti's thirteen-year-old daughter testified that prior to her father's death, she and her mother shared a bedroom because Mendotti was afraid that her husband would sexually abuse their daughter. Mendotti's daughter further testified that she saw her mother examine her underwear for signs of sexual abuse. Also, she testified that her mother kept a gun in a filing cabinet in their room and that her parents often argued about money and her mother's trips to Italy. On July 18, 1996, Mendotti was planning to take her daughter to Italy. Mendotti's daughter testified that she did not believe that her father knew about this trip because her mother told her not to tell him. On the day of the shooting, Mendotti took her daughter to the babysitter's house and was supposed to pick her up at 8 p.m. Mendotti, however, called at 6:30 p.m. and asked the babysitter to keep her daughter overnight, which was unusual.

The Mendotti's next door neighbor, Grace Pellos, testified at trial that on the evening of July 19, 1996, she was asleep in her bedroom when she heard four or five pounding noises. Ten to fifteen minutes later, she heard these noises again. In fact, Pellos heard these noises several times throughout the evening, but never saw anyone. Pellos further testified that she heard someone running or walking very fast from one room to the other, although she never heard any yelling or arguing.

At trial, Officer Robert Pignataro testified that he received a 911 telephone call from Mendotti on the night of the shooting. He testified that she told him that she and her husband

had been fighting and that he had tried to kill her, so Mendotti shot and killed him. When Officer Pignataro asked Mendotti if she had a weapon, she stated that she would not talk to him without a lawyer. Officer Harold Juntunen testified that he and his partner were dispatched to Mendotti's home immediately after the 911 call. Upon arrival, Mendotti met the police officers at the door. Officer Juntunen testified that Mendotti was calm and did not appear to be injured. After telling the police officers her name, Mendotti stated that she would not talk to them without a lawyer. At that time, the police officers took Mendotti into custody.

Detective William Rollet testified at trial that he saw Mendotti at the police station while she was in the processing room. He testified that other than complaining of abdominal cramps, Mendotti appeared calm. Further, he did not notice that she was injured although he took her to the hospital at her request because of her cramps. Later, Detective Rollet went to Mendotti's apartment and found passports for Mendotti and her daughter; an application for Italian citizenship; documents explaining transporting pets to Italy; airline tickets to Italy; handwritten notes about shooting, ammunition, and targets; and a February 29, 1996 letter showing a change of beneficiary in Nicholas Mendotti's will listing Mendotti and her daughter as beneficiaries.

Investigator Farahat Levy testified that on the night of the shooting, he went to Mendotti's apartment and observed her husband lying on the floor. He further testified that a total of 41 spent shell casings were found throughout the apartment. Moreover, three bullet holes were found in the walls of the apartment and two were found in the living room next to Nicholas Mendotti's body. Levy also testified that blood was on the floor near the body and on the wall next to him. Lyle Boicken, a forensic scientist with the Illinois State Police, testified that no skin or blood was recovered from the victim's fingernails. Furthermore, trial evidence

3

revealed that Mendotti shot her husband 38 times, two of which were inflicted at close range.

  **B.**  **Insanity Defense**

    **1.**  **Mendotti's Case**

In support of her insanity defense, Mendotti called Dr. Henry Lahmeyer, an expert in neuropsychiatry and forensic psychiatry. He testified that during his interviews with Mendotti, she told him that she began suspecting that her husband was sexually abusing their daughter when the child was two years old. On the night of the shooting, she and her husband argued over money and her plans to travel to Italy. Mendotti told Dr. Lahmeyer that she mixed up a milkshake with three bottles of sleeping pills in it and gave it to her husband. Her husband drank some of the milkshake, but detected a bitter taste. Mendotti then threw the milkshake out. After her husband went to bed, Mendotti shot him. She attempted to commit suicide after killing her husband, but decided against it for the sake of their daughter. Mendotti also told Dr. Lahmeyer that she knew she was in trouble and that is why she called 911 and told them that she had killed her husband in self-defense.

After the initial interview, Dr. Lahmeyer requested that Dr. Daniel Lilie, a clinical psychologist, administer psychological tests to Mendotti to determine if she was malingering of feigning mental illness. Dr. Lahmeyer testified that Dr. Lilie's report concluded that Mendotti was paranoid, but not psychotic and that she was not attempting to feign a psychiatric illness.

Dr. Lahmeyer also testified that during a second interview, Mendotti told him that she believed that her husband had tried to harm her. She also believed that her husband was having an affair, tried to poison her drinks, and rigged the wiring in her car to make it catch on fire. Mendotti also told Dr. Lahmeyer that she had attempted suicide at least five times, although

4

these attempts were never documented or verified by independent sources. Mendotti further revealed to Dr. Lahmeyer that she purchased a .38 caliber revolver in January 1993. During that same year, she attempted to press criminal charges against her husband for sexual abuse of their daughter. In addition, Mendotti told Dr. Lahmeyer that she frequently examined her daughter and her daughter's underwear for signs of sexual abuse. Dr. Lahmeyer testified that he believed Mendotti suffered from psychotic depression and a delusional disorder at the time of the shooting and that her behavior was disorganized and illogical. He concluded his testimony by opining within a reasonable degree of medical certainty that defendant was not legally sane or capable of conforming her actions to the law or appreciating the criminality of her actions on July 19, 1996.

At trial, Dr. Laurie Weiss, a pediatrician, testified that Mendotti brought her daughter to see her for a physical examination on November 9, 1992. That examination revealed possible sexual abuse, vaginal irritation, and constipation. Based upon that examination, Dr. Weiss filed a report with the Department of Children and Family Services (DCFS). Linda Brecka, a nurse at Gottlieb Hospital, testified that she interviewed Mendotti and her daughter at the emergency room on April 23, 1993. She further testified that Mendotti's daughter complained that her father had touched her in a private area. After the examination, Brecka notified DCFS of the alleged sexual abuse. Also, Maria Solis testified that on July 19, 1996, she was a nurse at Gottlieb Hospital when she interviewed Mendotti. Solis testified that Mendotti evaded her questions and appeared anxious. Also, Mendotti was disheveled and appeared to have been involved in a fight due to scratches and abrasions on her neck and forearms.

  2.  **State's Rebuttal**

In rebuttal, the State presented the testimony of Dr. Albert Stipes, a psychiatrist, and Dr. Michael Rabin, a licensed clinical psychologist, both of whom were employed by Forensic Clinic Services of the Circuit Court of Cook County. Drs. Stipes and Rabin evaluated Mendotti's mental status pursuant to court order. Dr. Rabin testified that he used the results of psychological tests, Mendotti's social and medical history, police records, and the written evaluations of Dr. Lahmeyer, Dr. Stipes, and Dr. Daniel Lilie. He testified that the tests indicated that Mendotti had a moderate depressive disorder, not a psychotic depression, and that she was mildly to moderately defensive based on her personality type. Dr. Rabin, however, never interviewed Mendotti or any of her family members and could not determine what her state of mind was at the time of the shooting. Based upon the information that he had, Dr. Rabin opined to a reasonable degree of medical certainty that Mendotti was able to conform her conduct to the requirements of the law and to appreciate the criminality of her actions.

Dr. Stipes testified that in evaluating Mendotti, he interviewed her, reviewed her hospital records, police reports, medical records, her handwritten notes, and her social history prepared by the Forensic Clinic Services. Although Mendotti had a history of suicide attempts, he concluded that she was not psychotic, but that she suffered from a personality disorder. He further testified that Mendotti's belief that her husband was attempting to harm her indicated that she was paranoid, but not necessarily delusional or psychotic. Dr. Stipes also testified that Mendotti's 911 call was "goal directed" in that by claiming self-defense and stating that she needed to speak with a lawyer, she was saying what was necessary to exculpate herself. He further testified that Mendotti had been on psychotropic medication. After a psychotic episode in December 1996, she was taken off the psychotropic medication and her mental condition

6

improved. Dr. Stipes testified that Mendotti's psychotic episode was attributable to an adverse drug reaction, not chronic mental illness. He concluded by stating to a reasonable degree of medical certainty that Mendotti was not suffering from a psychotic or delusional disorder, but a depressive and personality disorder and that she was legally sane at the time that she shot her husband. Dr. Stipes further testified that Mendotti was able to appreciate the criminality of her actions when she shot her husband on July 19, 1996.

## II.  Procedural Background

Following a 1999 bench trial in the Circuit Court of Cook County, Illinois, the trial court convicted Mendotti of first-degree murder and sentenced her to 56 years' imprisonment. (R. 17-1, Resp.'s Rule 5 Exs., Ex. A.) Menotti appealed her judgment of conviction and sentence to the Illinois Appellate Court, First District, where she raised four issues: (1) whether she proved by a preponderance of the evidence that she was not sane at the time of the offense; (2) whether the conviction should be reduced to second-degree murder based on an unreasonable belief in self-defense; (3) whether her sentence should be reduced because the term of imprisonment did not reflect her rehabilitative potential; and (4) whether she was entitled to a new sentencing hearing because the trial court considered multiple victim impact statements. (*Id.*, Exs. A-D.) The Illinois Appellate Court rejected Menotti's appellate arguments and affirmed the Circuit Court's judgment. (*Id.*, Ex. A.) Menotti filed a pro se petition for leave to appeal (PLA) to the Supreme Court of Illinois raising the same four issues she raised on direct appeal. (*Id.*, Ex. F.) The Supreme Court of Illinois denied her PLA on February 5, 2003. (*Id.*, Ex. G.)

On August 7, 2002, Menotti filed a pro se post-conviction petition in the Circuit Court of Cook County pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122–1, *et seq.*,

7

alleging that trial counsel was ineffective because he: (1) failed to inform her brother – who had power of attorney due to her mental condition – about the State's plea offer; (2) informed her only briefly about the State's plea offer; (3) did not inform her about the potential penalties for a murder conviction; (4) did not submit into evidence her medical records from Cermak Hospital in support of her contention that she was suffering from a mental condition; and (5) did not submit proof of her advanced educational level prior to her separation from her husband, which would have demonstrated that her medical condition had diminished. (*Id*., Ex. H, I.) Menotti further argued that she was denied a fair trial because the trial court considered multiple victim impact statements at sentencing. (*Id.*, Ex. H.) The post-conviction trial court summarily dismissed Menotti's post-conviction petition on September 20, 2002. (*Id.*, Ex. I.)

Menotti then appealed that post-conviction trial court judgment to the Illinois Appellate Court, First District, arguing that: (1) she was denied her due process right to a fitness hearing; (2) the post-conviction trial court erred in dismissing the petition because it stated the gist of a meritorious claim of ineffective assistance of counsel; and (3) the order dismissing her post-conviction petition was void because the trial court failed to comply with statutory notice provisions, specifically 725 ILCS 5/122-2.1(a)(2). (*Id.*, Exs. J-M.) The Illinois Appellate Court affirmed the Circuit Court's post-conviction judgment. Through counsel, Menotti filed a PLA in the Supreme Court of Illinois reasserting her ineffective assistance of counsel claims. (*Id.*, Ex. P.) The Supreme Court of Illinois denied Menotti's PLA on December 1, 2005. (*Id*., Ex. Q.

On November 17, 2006, Mendotti signed the present pro se petition for writ of habeas corpus, raising a single habeas claim – that trial counsel was constitutionally ineffective for failing to "raise [her] past history of mental problems to prove that she was not sane at the time

8

of the offense." (R. 1-1, Pet. at 5.) Menotti's habeas petition is timely in accordance with *Lawrence v. Florida,* 127 S.Ct. 1079, 1083 (2007) (one-year limitations period not tolled during pendency of petition for certiorari to the United States Supreme Court seeking review of denial of state post-conviction relief).

## LEGAL STANDARDS

**I.     Habeas Standard**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief cannot be granted unless the state court's decision was contrary to, or an unreasonable application of federal law clearly established by the Supreme Court. *See Calloway v. Montgomery,* 512 F.3d 940, 943 (7th Cir. 2008); *see also Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In *Williams*, the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Id.* at 405; *see Calloway,* 512 F.3d at 943.

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *Williams,* 529 U.S. at 407. "This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005); *see also Williams*, 529 U.S. at 410 (an ***unreasonable*** application of federal law is different from an ***incorrect*** application of

9

federal law) (emphasis in original). To be considered objectively unreasonable, a state court's decision must lie "well outside the boundaries of permissible differences of opinion." *Gilbert v. Merchant,* 488 F.3d 780, 790 (7th Cir. 2007) (quoting *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002)). Put differently, to be reasonable, a state court's decision must be "at least minimally consistent with facts and circumstances of the case." *Simpson v. Battaglia,* 458 F.3d 585, 592 (7th Cir. 2006).

## II. Procedural Default

Before bringing a habeas claim in federal court, a petitioner must exhaust all remedies available to him in state court. *See Lieberman v. Thomas,* 505 F.3d 665, 669 (7th Cir. 2007). More specifically, the "petitioner must establish that he fully and fairly presented his claims to the state appellate courts, thus giving the state courts a meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge." *Bintz v. Bertrand,* 403 F.3d 859, 863 (7th Cir. 2005); *see Johnson v. Loftus,* 518 F.3d 453, 455 (7th Cir. 2008). "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Lewis v. Sternes,* 390 F.3d 1019, 1026 (7th Cir. 2004); *see also Lieberman,* 505 F.3d at 670-71. Also, a habeas claim is procedurally defaulted when the state court did not address the merits of the petitioner's federal claim because the petitioner failed to meet independent and adequate state court procedural requirements. *See Stewart v. Smith,* 536 U.S. 856, 860-61, 122 S.Ct. 2578, 2581,153 L.Ed.2d 762 (2002); *Johnson,* 518 F.3d at 455.

A habeas petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice or by showing that the Court's failure to consider the claim would

10

result in a fundamental miscarriage of justice. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Supreme Court defines cause sufficient to excuse procedural default as "some objective factor external to the defense" which prevents a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). A fundamental miscarriage of justice occurs when a petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496.

## ANALYSIS

**I.      Ineffective Assistance of Counsel Claim**

Mendotti maintains that her counsel was ineffective for failing to rebut the State's evidence that she was legally sane at the time of the offense. Specifically, Mendotti argues that trial counsel was ineffective because he did not introduce her medical records and medical history to rebut Dr. Stipes' trial testimony. The clearly established Supreme Court law that applies to Mendotti's ineffective assistance of counsel claim is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish constitutionally ineffective assistance of counsel, Mendotti must show that (1) her attorneys' performance "fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694 ("a reasonable probability is a probability sufficient to undermine confidence in the outcome"); *Suggs v. United States,* 513 F.3d 675, 678 (7th Cir. 2008). If Mendotti fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other. *See Strickland,* 466 U.S. at 697; *Amerson v. Farrey,* 492 F.3d 848, 851 (7th

Cir. 2007).

First, in rejecting Mendotti's ineffective assistance of counsel claims on post-conviction appeal, the Illinois Appellate Court properly identified the clearly established Supreme Court law:

> Ineffective assistance of counsel is established when a defendant demonstrates that counsel's representation fell below an objective standard of reasonableness, and that, but for counsel's shortcomings, the outcome of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687, 80 L.Ed.2d 674, 693, 104 S.Ct. 2052, 2064 (1984). Both prongs of the Strickland test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. See People v. Frieberg, 305 Ill.App.3d 840, 849 (1999). Courts can resolve ineffectiveness claims by reaching only the prejudice component because lack of prejudice renders counsel's performance irrelevant. Frieberg, 305 Ill.App.3d at 849-50.

*See People v. Menotti,* 1-02-3413, at *8 (Ill.App.Ct. Mar. 3, 2004) (unpublished opinion).

In analyzing Mendotti's argument that trial counsel was constitutionally ineffective because counsel did not present Mendotti's medical records and history to rebut Dr. Stipes' trial testimony, the Illinois Appellate Court concluded:

> [C]ounsel's failure to present defendant's medical records as evidence is a matter of trial tactics or strategy, which is purely a matter of professional judgment and cannot support a claim of ineffective representation. Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with defense counsel (People v. Ramey, 152 Ill.2d 41, 53-55 (1992)), and generally are immune from ineffective assistance of counsel claims (People v. Guest, 166 Ill.2d 381, 394 (1995)). Here, the record shows that trial counsel presented a coherent and vigorous defense by attempting to undermine the State's case-in-chief through the testimony of an expert witness who directly rebutted that of the State's witnesses. Therefore, defendant has failed to demonstrate that trial counsel's performance fell below an objective standard of reasonableness. It follows then that defendant was not prejudiced by counsel's representation, and accordingly we reject the claims of ineffective assistance of counsel.

*See People v. Menotti,* 1-02-3413, at *9.

The Illinois Appellate Court's decision is consistent with the facts and circumstances of this case, and thus is a reasonable application of *Strickland. See Simpson,* 458 F.3d at 585; *see also* 28 U.S.C. § 2254(d)(1). As the appellate court explained, trial counsel presented extensive evidence through Dr. Henry Lahmeyer's trial testimony that Mendotti was not legally sane at the time she killed her husband. Counsel also presented trial testimony through other health care professionals in support of Mendotti's insanity defense. Therefore, the Illinois Appellate Court's conclusion that trial counsel's performance did not fall below an objective standard of reasonableness is a reasonable application of *Strickland. See id.* at 689 (strong presumption that counsel's conduct falls within wide range of reasonable professional assistance); *see also Gilbert*, 488 F.3d at 790 (unreasonable state court decision lies "well outside the boundaries of permissible differences of opinion."). Accordingly, Mendotti has failed in her burden of demonstrating that the Illinois Appellate Court's decision was objectively unreasonable. *See Woodford v. Visciotti,* 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

## II.     Additional Habeas Claims

On May 3, 2007, Mendotti filed a reply to Respondent's Answer that contained over 60 additional "issues" for the Court to consider, including factual arguments supporting her ineffective assistance of counsel claim, as well as new habeas claims. (R. 21-1.) The vast majority of these new claims are procedurally defaulted. First, Mendotti's ineffective assistance of appellate counsel claims are procedurally defaulted because she did not raise them in her state court proceedings and offers no explanation for her default. *See Coleman,* 501 U.S. at 750; *Johnson,* 518 F.3d at 455-56. Similarly, Mendotti's additional bases for her ineffective assistance of trial counsel claims are procedurally defaulted because Mendotti did not raise them

13

in her post-conviction petition or on post-conviction appeal and offers no explanation for this default. *See Lewis,* 390 F.3d at 1026 (petition must assert federal claim at each level of state court review to avoid procedural default); *see also Johnson,* 518 F.3d at 455-56. Meanwhile, Mendotti's habeas claim concerning a fitness hearing is procedurally defaulted because the Illinois Appellate Court concluded that she waived this claim – therefore she failed to meet independent and adequate state court procedural requirements. *See Stewart v. Smith,* 536 U.S. 856, 860-61, 122 S.Ct. 2578, 2581,153 L.Ed.2d 762 (2002); *Johnson,* 518 F.3d at 455. Because Mendotti offers no explanation for this default, the Court cannot review the merits of this claim on collateral review. *See Miranda v. Leibach,* 394 F.3d 984, 997 (7th Cir. 2005).

Finally, Mendotti's habeas claims of ineffective assistance of appellate counsel on post-conviction appeal are not cognizable on habeas review because criminal defendants do not have a Sixth Amendment right to post-conviction counsel. *See Coleman,* 501 U.S. at 752 (citing *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)); *see also* 28 U.S.C.A. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

For the sake of completeness, however, the Court will address the remaining claims that were not procedurally defaulted in state court – although Mendotti raised them for the first time in her habeas reply brief. *See Amerson,* 492 F.3d at 852 (arguments made for first time in reply brief are waived). These remaining claims allege ineffective assistance of trial counsel based on counsel's failure to inform Mendotti of the direct consequences of accepting or rejecting the State's plea offer, including the penalties for a murder conviction, and counsel's failure to advise

14

her brother, who had power of attorney over her affairs, that a plea offer had been made.

In addressing these claims, the Illinois Appellate Court applied the standard in *Strickland,* as outlined above, in concluding:

> In order for the decision to accept or reject a plea offer to be knowingly and voluntarily made, a criminal defense attorney must fully inform himself of the facts and the law relevant to the State's offer and candidly advise his client as to the direct consequences of accepting or rejecting the offer. People v. Brown, 309 Ill.App. 3d 599, 605 (1999). Part of this obligation is satisfied when defense counsel accurately informs his client of the maximum and minimum sentences that can be imposed for the offenses charged by the State. Brown, 309 Ill.App.3d at 605.
>
> Here, we find that although counsel's representation was deficient in that he failed to advise her of the maximum and minimum sentences which could be imposed for first-degree murder, defendant was not prejudiced by his actions because prior to trial she was fully advised of the charges and the sentencing range by the trial court and stated on the record that she fully understood. The trial court also questioned defendant as to whether she understood the charges, as well as the possible penalties before asking her how she wished to plead. Defendant responded that she understood the charges and the possible penalties and wanted to plead not guilty. We, therefore, reject defendant's claim of ineffective assistance of counsel. We likewise reject defendant's unsupported assertion that counsel was ineffective for failing to advise her brother of the plead offer since the decision as to whether to accept or reject a plea offer can only be made by the defendant. Brown, 309 Ill. App. 3d at 605.

*See People v. Menotti,* 1-02-3413, at *8-9.

Again, the Illinois Appellate Court's decision is consistent with the facts and circumstances of this case, and thus is a reasonable application of *Strickland. See Simpson,* 458 F.3d at 585; *see also* 28 U.S.C. § 2254(d)(1). As the Illinois Appellate Court reasoned, counsel's performance did not prejudice Mendotti because the trial court fully advised her of the charges and sentencing range and Mendotti stated on the record that she fully understood. The trial court further questioned Mendotti if she understood the charges before asking how she wished to plead and Mendotti responded that she understood the charges and the possible penalties and wanted to

15

plead not guilty.  Based on this analysis, the Illinois Appellate Court's determination that counsel's conduct did not prejudice Mendotti is a reasonable application of *Strickland,* namely, that there was not a reasonable probability that, but for counsel's deficient conduct, the result of the proceeding would have been different.  *See id.* at 694.  Finally, the Illinois Appellate Court's conclusion that counsel's failure to advise Mendotti's brother of the plea offer did not prejudice Mendotti for the reasons stated above.  *See Strickland*, 466 U.S. at 694.  As such, Mendotti has failed in her burden of demonstrating that the Illinois Appellate Court's decision was an objectively unreasonable application of *Strickland*.  *See Woodford,* 537 U.S. at 24-25.

## CONCLUSION

For these reasons, the Court denies Menotti's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(1).

**Dated:**  July 14, 2008

                                        **ENTERED**

                                      **AMY J. ST. EVE**
                                      **United States District Judge**